**UNITED STATES of America**

v.

**Francis X. LIVOTI, Defendant.**

**No. 98 CR. 25 (SAS).**

United States District Court,
S.D. New York.

Oct. 7, 1998.

Mark F. Pomerantz, Andrew S. Dember, Serene K. Nakano, United States Attorney's Office, New York City, for U.S.

Stuart London, Worth, Longworth & Bamundo, New York City, for Defendant.

## OPINION

SCHEINDLIN, District Judge.

On June 26, 1998, following a two-week jury trial, Defendant Francis X. Livoti was convicted of violating the civil rights of Anthony Baez, in violation of 18 U.S.C. § 242. In anticipation of his upcoming sentence, a Presentence Report ("PSR") has been prepared. The defendant has objected to various portions of the PSR. The defendant has also submitted a motion for a downward departure. The Government, in turn, has submitted a Sentencing Memorandum, defending the PSR and moving for an upward departure. The defendant has submitted a response to the Government's Sentencing Memorandum.

There are three major disputes, all of which involve issues of law. The first dispute is over the appropriate base offense level required by United States Sentencing Guidelines ("U.S.S.G.") § 2H1.1(a)(1). The second concerns the applicability of the specific offense characteristic found at U.S.S.G. § 2H1.1(b). Finally, the parties disagree as to whether an enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, is warranted.

Because all of these disputes raise complicated issues of fact and law, I believe it is necessary to decide them in a written opinion so that the parties have a full and reasoned

explanation of my decisions. In order to understand the discussion of the legal issues it is necessary to briefly summarize two portions of the testimony: (1) the description of the actual confrontation between the defendant and the victim; and (2) the medical testimony regarding the cause of death.

## I. Factual Background

### A. Overview

At trial, four members of the Baez family testified that they saw Livoti restrain Anthony Baez in a choke hold on the morning of December 22, 1994. Trial Transcript ("Tr.") at 93–96, 102–04, 105, 223–25, 327–28, 412–13. According to the testimony of family members and police officers, Anthony Baez was then lowered to the ground, where he remained motionless until he was carried by four police officers to a patrol car and taken to Union Hospital. Tr. at 111–14, 116–19, 230–32, 234, 334–35, 338–39, 414–16, 472–74, 478, 480, 915–17, 1290–95, 1320–22, 1326–29. After arriving at the hospital, Anthony Baez's father told Dr. Kim Jaggers, an emergency room physician, that his son had been choked. Tr. at 418, 482–83, 526. Dr. Charles Hirsch, the Chief Medical Examiner of the City of New York, testified that the cause of Anthony Baez's death was asphyxiation due to neck and chest compression, Tr. at 637, and that, in his opinion, the neck compression was caused by a choke hold which lasted for at least one minute. Tr. at 627–28, 640–42.

### B. Detailed Account of the Confrontation Revealing Lack of Provocation

The following account of the incident summarizes the credible evidence with respect to the events of December 22, 1994.[1] Henry Bothwell, one of the Baez brothers, testified that he, Anthony Baez, David Baez and Ramon Baez, Jr. were playing football outside their home when a police car pulled up and parked in the street. See Testimony of Henry Bothwell ("Bothwell Tr.") at 184. Between five and ten minutes later, another police car arrived. See id. at 186. This car

came straight up to Ramon and David's location and almost hit David, causing him to "jump back." See id. at 187–88; Testimony of David Baez ("D. Baez Tr.") at 306. David walked toward the passenger side of the car and asked the driver, Francis Livoti, why he was trying to hit them. See Bothwell Tr. at 244; D. Baez Tr. at 307. This car then backed away and double-parked next to the other police car. See Bothwell Tr. at 188.

Some time later, Anthony threw the football toward Henry, but it went over his head and hit the trunk of one of the police cars. See id. at 190. A few minutes later, the ball hit the police cars again. See id. at 192.

After the football hit the police car, Livoti came out of the second car and started yelling and cursing at the Baez brothers to "get the hell out of here." See id. at 192–94; D. Baez Tr. at 311–12. He appeared angry and said "I want you the fuck out of here, I want you to go to your fucking home, I want you to go to a fucking park." See Bothwell Tr. at 193; D. Baez Tr. at 312–13. Either Anthony or Henry told Livoti that "this is where we live." See Bothwell Tr. at 193. According to Henry, nobody touched Livoti, nobody made any threatening gestures toward him and none of the brothers had any weapons. See id. at 194–95.

After this incident, the four brothers backed away and huddled, deciding whether or not to continue with the game. See id. at 195. They decided to keep playing, but agreed that they would play the game in only one direction, rotating sides after each touchdown, so that they would not throw the ball in the direction of the police cars. See id. at 195–96.

Shortly thereafter, Anthony threw the ball to Henry. See id. at 208. Livoti came out of the car. See id. He appeared angry and he came toward them, swearing. See id. at 208–09; D. Baez Tr. at 313–14. He said "didn't I tell you fucking guys to get out of the area? I want you to go the fuck home." See id. at 209. He went up to Raymond, saying "who's

---

1. As noted, *infra,* the testimony offered by Livoti was directly contradictory to critical portions of this testimony.

the ringleader, who's going to fight me now." *See id.* at 209; D. Baez Tr. at 314.

Raymond started backing away from Livoti, raising his hands in the air with his palms facing Livoti. *See* Bothwell Tr. at 210. Henry and Anthony were in front of Livoti, and they stood where they were. *See id.* David walked around them, sat on the front bumper of Ramon Baez Jr.'s jeep, which was parked on the street, and said he was going to sit on the jeep and was not going home. *See id.* at 211; D. Baez Tr. at 314. As soon as David sat down, Livoti went over to him and said that he was going to spend his Christmas in Rikers. *See* Bothwell Tr. at 212; D. Baez Tr. at 314. He then turned him around, faced him down on the hood of the jeep and handcuffed him. *See* Bothwell Tr. at 212; D. Baez Tr. at 315–316. David did not resist or struggle with Livoti as he was being cuffed. *See* Bothwell Tr. at 214; D. Baez Tr. at 316. Livoti then took David over to the police car, pulling on his cuffs. *See* Bothwell Tr. at 213; D. Baez Tr. at 316–19.

At this point, Henry and Anthony started walking toward the police car, with Raymond behind them. *See* Bothwell Tr. at 215. By the time they got to the jeep, Livoti was walking back toward them. *See id.* Livoti approached Anthony, the most vocal in protesting David's arrest, who was saying, "I know my rights, I know what you are doing is wrong, I'm a security officer in Orlando." *See id.* at 215–16; D. Baez Tr. at 319–22. Livoti told Anthony to "shut the hell up or [you're] going to go in too." *See* Bothwell Tr. at 216. Livoti then pushed Anthony to the back of the jeep. *See id.* According to Henry, Anthony did not push Livoti or move his hands toward him in any way. *See id.*

Livoti then attempted to put Anthony's hands behind his back. *See id.* at 218–20. Anthony held his hands to his chest, with his elbows pulled in against his body, and Henry saw Livoti grab his by the arm and try to pull it towards his back. *See id.* Anthony resisted having his arms pulled back, struggling not to get cuffed. *See id.* at 220, 247, 288. Another officer then joined Livoti.

Henry pleaded with the officers to let Anthony go, telling them that his brother had asthma. *See id.* at 221–22. Henry reached toward Anthony and tried to grab him, but the other officer turned around and faced Henry. *See id.* Henry backed away, and he saw Anthony leaning forward. *See id.*

Henry then saw Livoti go and grab Anthony around the neck and pull him back up. *See id.* at 222–23, 260–61. Livoti's back was toward the jeep, his right arm, including the crook of the arm, was around Anthony's neck and the other arm was on his back. *See id.;* D. Baez Tr. at 324, 381–82, 377; Testimony of Raymond Baez, Sr. ("R. Baez Tr.") at 413. Livoti had one leg underneath Anthony, and to David, it appeared that Livoti was trying to flip him down to the ground. *See* D. Baez Tr. at 324–25.

While Livoti had his arm around Anthony's neck, Henry started backing up toward the house, calling for his father. *See* Bothwell Tr. at 224–25. He turned around toward the house and was tackled by one of the officers and handcuffed. *See id.* at 225–27. David had exited from the police car and was running toward the house, past where Anthony and Livoti were standing. *See* D. Baez Tr. at 327–29. A police officer jumped on David's back and threw him to the ground. *See id.* at 332. Another officer put a gun to his head. *See* Bothwell Tr. at 228; D. Baez Tr. at 332.

The officer who tackled Henry picked him up and put him in the first police car. *See* Bothwell Tr. at 229. As they were walking to the car, Henry looked toward the back of the jeep and saw Anthony laying motionless on the ground with his eyes closed. *See id.* at 229–231; D. Baez Tr. at 334–35. Livoti was on top of him, with his knee on Anthony's back, handcuffing him, and two or three other officers were standing around. *See* Bothwell Tr. at 230; D. Baez Tr. at 335–38; R. Baez Tr. at 414–15.

By the time Anthony arrived at the hospital at 2:05 a.m., he had no blood pressure, no pulse rate, and no respiratory rate. *See* Tr. at 503 (testimony of emergency room physician Dr. Kim Jaggers).

## C. The Cause of Death

The Government called Dr. Charles Hirsch, New York City's Chief Medical Ex-

aminer, to testify regarding the cause of death. Dr. Hirsch based his conclusion on autopsy findings, including an examination of the autopsy reports, photographs and microscopic examination of certain tissue samples, as well as eyewitness descriptions of the events. Based on this evidence Dr. Hirsch concluded that Baez died due to asphyxiation, which means lack of air. Tr. at 628; 637.

When asked his opinion as to the cause of death, Dr. Hirsch responded:

It is my opinion that the primary cause of death of Mr. Anthony Baez was asphyxia, due to compression of his neck and chest. It is also my opinion that acute and chronic asthma were contributory, lesser factors in his death.

*Id.* at 637. He further testified that "Mr. Baez's injuries resulted from a choke hold." *Id.* at 640.

[T]here was a compressive squeezing force exerted on his neck from side to side. The most reasonable explanation for this is a form of choke hold in which the assailant's elbow, the bend of the elbow is in the front of the neck, and the bicep and forearm close in a vice-like manner to squeeze and compress the neck from side to side.

*Id.* at 640–41. Dr. Hirsch described this type of choke hold as a "carotid sleeper choke hold" designed to "compress the carotid arteries which provide the main source of blood to the brain." *Id.* at 641.

It is at this point that the evidence becomes somewhat confusing. Dr. Hirsch concludes that while the physical evidence, such as internal bruising of the muscles, reveals that a carotid sleeper choke hold was applied, it was not successful because the carotid arteries were not compressed. *Id.* at 642. Dr. Hirsch knew this because blood continued to be pumped into Baez's face. *Id.* However, because the veins in Baez's neck were compressed by the choke hold, the blood was unable to drain out, causing the shower of petechiae or tiny hemorrhages found in Baez's face and neck. *Id.*

Dr. Hirsch further testified that it would take approximately one minute of compression of the neck or chest to produce the petechiae found in Baez's body. *Id.* at 646. He concluded that Baez would have been rendered unconscious at the end of that period. Tr. at 649. Dr. Hirsch then testified as follows:

The mechanism of unconsciousness in Mr. Baez's case in my opinion resulted from two factors. One is the impairment of return of venous blood from his face and brain. The second is the compression of his airway, of his upper air passages, and a backward and upward displacement of the base of his tongue. That covers the top of the larynx or obstructs the top of the larynx in a fashion such that you can't breathe....

*Id.*

Thus, according to Dr. Hirsch, the defendant's application of a choke hold, which was evidenced by petechial hemorrhaging in Baez's face and neck as well as bilateral internal bruising, compressed Baez's upper air passages and displaced his tongue so that it blocked his airway.

Livoti called Dr. Cyril Wecht, the Director of Forensic Pathology at St. Francis Central Hospital in Pittsburgh, Pennsylvania. Dr. Wecht gave the following testimony with respect to the cause of death.

This gentleman had an acute and chronic bronchial asthma.... So you put all of that together, and this would be a situation in which I would understand quite easily as a forensic pathologist that the death was attributable to cardiac arrhythmia, abnormal beating of the heart precipitated by bronchial asthmatic attack that led to diminished oxygenation that produces hypoxia, insult to the heart, causing it to beat erratically.... The cause of death in this particular case, such as we have just discussed ... would be cardiac arrhythmia, due to hypoxia due to acute and chronic asthma.

Tr. at 1043–46. Dr. Wecht reached this conclusion, in part, because he found no evidence that Baez had been the victim of a choke hold. He noted that there was no damage to the structure of the neck, and no scratches on the neck indicating that Baez might have tried to free his neck from a choke hold. Tr. at 1028, 1031. In addition, he offered an

explanation for the bilateral bruising on the inside surfaces of the neck. With respect to the large area on the left side, he testified that:

> [Y]ou have these movements, and you have the arms moving and maybe flailing, and an arm coming up and striking with some force in this area, sternocleidomastoid, breast bone, clavicle, you know, you can do this.

Tr. at 1035. Regarding the smaller area on the right side, he testified that:

> [Y]ou could get that hemorrhage in that area from the pressure applied in the application of the Ambu-bag pressing up and trying to get it positioned....

Tr. at 1038–39. Finally, Dr. Wecht gave the following explanation for the petechial hemorrhages:

> The petechial hemorrhages, in my opinion, in this case were caused principally by the state of hypoxia the decreased oxygen, the cardiac arrhythmia then which sent into motion leading to an even greater diminution or compromise of oxygenation, coupled with the chest compressions that took place for 45–50 minutes at the hospital, coupled with whatever kind of compression may have taken during the struggle between Mr. Livoti and the other police officers and Mr. Baez.

Tr. at 1099.

During cross-examination, however, Dr. Wecht agreed that chest and/or neck compression helped to trigger Mr. Baez's attack of bronchial asthma. Tr. at 1093–94. He further agreed that the petechial hemorrhages could have been caused by compression of the neck. Tr. at 1101. He explained that neck compression could have occurred because: "there was some limited, quite fleeting, compression in the grasping and grabbing. I think that that's part of anybody's story...." Tr. at 1093.

■ While the issue is not free of doubt, I find that the fair preponderance of the credible evidence, favors the conclusions of Dr. Hirsch. I conclude that the defendant's use of a choke hold caused Baez's asphyxiation by restricting his breathing. While the victim's acute and chronic asthma, as well as his obesity, made it even more difficult for him to breathe, the choke hold was the immediate cause of Baez's death due to asphyxiation. Dr. Wecht's medical conclusions were informed, in part, by his acceptance of the police version of the events rather than those reported by the Baez family. On the other hand, both this Court and the jury have accepted the version reported by the Baez family. It is clear to me that if Dr. Wecht accepted that version of the events, he would essentially reach the same conclusion as Dr. Hirsch—namely that Baez died of asphyxiation due to the neck compression caused by the choke hold. Nothing in his testimony is inconsistent with that hypothesis.

## II. Discussion

### A. The Appropriate Base Offense Level

The parties agree that the appropriate guideline for the offense of conviction, 18 U.S.C. § 242 ("deprivation of rights under color of law"), is found by applying U.S.S.G. § 2H1.1(a), which requires the Court to use the greatest of four choices, the first of which is the offense level from the offense guideline applicable to any underlying offense. The Probation Department and the Government argue that the appropriate underlying offense is voluntary manslaughter, which carries a base offense level of 25. The defendant argues that the third choice should apply, which describes the use of force against a person and carries a base offense level of 10. I disagree with both.

Before the appropriate underlying offense can be determined, the court must decide whether Livoti killed Baez. Because in a civil rights case, the fact that the victim died is not an element of the crime, the jury in this case did not have to reach this issue. The determination of what killed Baez must now be decided by this Court.

■ Under the Sentencing Guidelines, a court need only resolve disputed facts relevant to the sentencing by a preponderance of the evidence. *See United States v. Concepcion,* 983 F.2d 369, 388 (2d Cir.1992); *United States v. Guerra,* 888 F.2d 247, 251 (2d Cir. 1989). If the Court were to find that Livoti was not responsible for Baez's death, as Li-

voti argues, then the Court would be required to apply the offense level set forth in U.S.S.G. § 2H1.1(a)(3), describing an offense involving the use or threat of force against a person and setting a base offense level of 10. As discussed in some detail in the previous section, however, I find that the choke hold applied by Livoti caused the asphyxiation which killed Baez.

### 1. The Relevant Classifications

The next question, then, is whether Livoti committed murder, voluntary manslaughter, or involuntary manslaughter, either in a reckless or criminally negligent manner. The distinction between these terms is not easy to describe or, comprehend. The most difficult element, of course, is the required state of mind, or intent. A brief discussion of each term is necessary:

 a. Murder. To prove a murder in the second degree, the Government must establish each of the following elements: (1) that the defendant killed the victim; (2) that the defendant acted unlawfully; and (3) that the defendant acted with malice aforethought.[2] *See* 2 Leonard B. Sand et al., *Modern Federal Jury Instructions* ¶ 41.01, at 41–5 (1995) ("Sand ¶ __, at __"). Here, the proof at trial established that Livoti killed Baez and that he acted unlawfully in applying a choke hold, which had been banned by the Police Department, thereby constituting an illegal assault. The remaining element, malice aforethought, requires further definition.

Malice is the state of mind that would cause a person to act without regard to the life of another. To satisfy this element, the defendant must have acted consciously, with the intent to kill another person. However, the government need not prove a subjective intent to kill on the part of the defendant. It would be sufficient to satisfy this element if it proved *reckless and wanton conduct on the part of the defendant which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death.* In order to

establish this element, the government must prove that the defendant acted willfully, with a bad or evil purpose to break the law.

Sand ¶ 41.01, at 41–13 (emphasis added). Common law malice includes three distinct mental states, any one of which is sufficient to prove murder: (1) intent to kill; (2) intent to do serious bodily harm; and (3) a "depraved heart." 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.1(a), at 183 (1986) ("LaFave & Scott § __, at __"). A depraved heart represents a *level of extreme recklessness and wanton disregard for human life. See United States v. Browner,* 889 F.2d 549, 553 (5th Cir.1989).

 b. Voluntary Manslaughter. To prove voluntary manslaughter, the Government must establish each of the following elements: (1) that the defendant killed the victim; (2) that the defendant acted unlawfully; and (3) that the defendant did so in a sudden quarrel or the heat of passion. *See* Sand ¶ 41.02, at 41–39. Here, once again, the proof at trial establishes that Livoti killed Baez and that he acted unlawfully in applying the choke hold. The remaining element, "heat of passion," requires further definition.

The basic inquiry is whether or not at the time of the killing, the reason and judgment of the defendant was obscured or disturbed by passion ... to such an extent as would cause an ordinarily reasonable person of average disposition to act rashly and without deliberation and from passion rather than judgment. Before you may find that the defendant acted in the heat of passion, you must also find that *there was adequate provocation. Here, too, the provocation or acts arousing such passion must be such as to create the same degree of passion in a reasonable man and cause him to lose self-control.* The question is, was the provocation so slight to arouse passion, or was it sufficient to cause an ordinary man, a reasonable man, an average man, to become aroused? Would the ordinarily reasonable man, placed in the same position in which the defendant found

---

**2.** First degree murder would also require that the defendant acted with premeditation. Because there is no proof of premeditation in this

case, I will not discuss first degree murder or this particular element.

himself, and knowing what the defendant then knew or believed he knew, have been thrown into such heat of passion?

Sand ¶ 41.02, at 41–46, 47 (emphasis added); *see also United States v. Scafe*, 822 F.2d 928, 932 (10th Cir.1987) (malice is negated by the fact that intentional killing occurred in the heat of passion in response to a sufficient provocation).

 c. Involuntary Manslaughter. To prove involuntary manslaughter, the Government must establish each of the following elements: (1) that the defendant killed the victim; (2) that the defendant acted unlawfully; and (3) that the defendant acted with gross negligence and had either actual knowledge or reason to know that his conduct was a threat to the lives of others. *See* Sand ¶ 41.02, at 41–50. Here, once again, the proof at trial establishes that Livoti killed Baez and that he acted unlawfully in applying the choke hold. The remaining element, including the concepts of "gross negligence" and "actual knowledge," requires further definition.

> Gross negligence means conduct amounting to wanton or reckless disregard for human life. If . . . the defendant had neither actual knowledge nor reason to know that his conduct was a threat to the lives of others or if . . . he did not act with gross negligence . . . then [he is] not guilty.

Sand ¶ 41.02, at 41–57. *See also Browner*, 889 F.2d at 553 (rather than the malice required for murder, the requisite mental state

is reduced to "gross" or "criminal" negligence, which is something less than the most extreme recklessness and wantonness required for "depraved heart" malice); LaFave & Scott §§ 7.1, 7.12(a), at 183, 278.

**2. Classifying Livoti's Conduct**

 I first conclude that Livoti's conduct cannot be classified as voluntary manslaughter. Thus, his conduct either was sufficiently reckless and wanton to meet the alternative standard for malice required to prove second-degree murder; or his conduct was grossly negligent such that he committed involuntary manslaughter. I reach this conclusion for the simple reason that crediting the version of the events proffered by the Government and summarized at Section I.B, above, there was *no adequate provocation* by the victim from which to find that Livoti acted in the heat of passion.[3] No reasonable person, indeed no reasonable police officer, would have lost self-control and been murderously aroused by a kid refusing to go home or by his brother telling the officer that there were no grounds for his arrest. The only conduct by Anthony Baez that could reasonably be considered provocation was his resistance to having his hands put behind his back to be cuffed. The credible testimony reveals, however, that Anthony's hands were on his chest, with his elbows pulled in; he was not striking at or fighting with Livoti. *See* Bothwell Tr. at 218–220. This level of resistance is inadequate to send a *reasonable* police officer into a passion of rage in which he loses his self-control.[4]

---

**3.** The Government argues that Livoti's conduct qualifies as voluntary manslaughter because it occurred in the course of a "sudden quarrel." Although the phrase "sudden quarrel" is not well defined in the federal case law, the cases that do address the phrase suggest that it is not distinct from the element of "heat of passion," and that "sudden quarrel" is but one type of provocation. *See United States v. McRae*, 593 F.2d 700, 705 (5th Cir.1979) ("it is surely not the quarrel that signifies but the heat of passion that it occasions"); *United States v. Martinez*, 988 F.2d 685, 696 (7th Cir.1993) ("it may be arguable that the 'sudden quarrel' term is an anachronism with no meaning not adequately served by a proper definition of heat of passion"). Indeed, Judge Sand points out that no reported cases have required a charge for "sudden quarrel" separate from "heat of passion." Sand ¶ 41.02, at 41–48.

Moreover, even if the term "sudden quarrel" has a separate meaning apart from "heat of

passion," it is applicable where the parties "willingly engage in mutual combat, and during the fight one kills the other as the result of an intention to do so formed during the struggle." LaFave & Scott § 7.10, at 257; *see also Martinez*, 988 F.2d. at 696 ("sudden quarrel" charge not applicable where defendant did not willingly engage in mutual combat but entered the ongoing encounter to aid one of the combatants). Because Anthony Baez did not willingly engage in combat with Livoti—indeed he did not engage in any combat with Livoti—Livoti's conduct cannot be characterized as voluntary manslaughter based on a sudden quarrel.

**4.** "What is really meant by 'reasonable provocation' is provocation which causes a reasonable man to lose his normal self-control; and, although a reasonable man who has thus lost control over himself would not kill, yet his homicidal

■ Indeed, the Government, itself, tried this case on the theory that none of the Baez brothers did anything to provoke the attack. In these circumstances, Livoti's offense cannot be shoehorned into the limited category of voluntary manslaughter, which requires that the defendant acted in the heat of passion.[5]

■ The next question, then, is to distinguish the degree of intent that separates murder from involuntary manslaughter. This distinction turns on the degree of risk created by the defendant's intentional conduct. Thus, according to LaFave & Scott, murder requires a "very high degree" of risk that death or serious bodily injury will result from the defendant's conduct; while manslaughter requires a "high degree of risk" (which is more than an unreasonable risk). *See* LaFave & Scott §§ 7.4, 7.12(a), at 199-200, 278. Under either murder or involuntary manslaughter, if the defendant who creates a risk realizes that he does so, his conduct is reckless. *See id.,* at 200, 278. Thus, involuntary manslaughter, which does not rise to the level of negligence or recklessness required for murder, "differs from murder only in that it requires a reduced level of culpability in committing the same physical act." *Browner,* 889 F.2d. at 553.

■ Upon reviewing all of the evidence, I conclude that Livoti acted with a *high* degree

of risk that his conduct would result in death or seriously bodily injury, but did not act with a *very high* degree of risk or with such recklessness and wantonness as to rise to the level of a finding of murder. I rely on the following to reach this conclusion: (1) the training film used by the Police Department warns that choke holds are prohibited because they may cause death by asphyxiation, although such deaths occur very rarely in the course of an arrest;[6] thus, the film would not lead a reasonable officer to conclude that a choke hold would inevitably cause death, although it would lead an officer to conclude that such conduct would present a serious risk of death; (2) Livoti was also aware of an Interim Order of the Police Department, dated October 20, 1993, and Patrol Guide Procedure 104–01, both forbidding the use of choke holds;[7] (3) it is highly likely from all the material that I have considered that Livoti had previously used a carotid sleeper choke hold and believed that it would render a victim unconscious rather than cause him serious bodily injury; and (4) Dr. Hirsch, himself, appeared to conclude that it was somewhat unexpected for a carotid sleeper choke hold to cause death by asphyxiation, suggesting that this was a result that was possible, but not likely to occur. For these reasons, Livoti's conduct fits the definition of involuntary manslaughter better than that of second degree murder.[8]

reaction to the provocation is at least understandable. Therefore, one who reacts to the provocation by killing his provoker should not be guilty of murder. But neither should he be guilty of no crime at all. So his conduct falls into the intermediate category of voluntary manslaughter." LaFave & Scott § 7.10(b), at 256.

5. The states of mind required for voluntary manslaughter—intent to kill, intent to do serious bodily harm or depraved heart—are the same as those required for murder, except that in voluntary manslaughter, malice is negated due to the element of "heat of passion." *Browner,* 889 F.2d. at 553. As an alternative ground, and as discussed more fully, *infra,* because Livoti did not intend to kill or cause serious bodily harm and he did not evince a "depraved heart," his conduct does not rise to the level of voluntary manslaughter.

6. The training film, which was received in evidence as Government's Exhibit 13, was played to the jury at trial. *See* Tr. at 615–16. The first

portion of the fifteen minute film discusses the risk of causing death by asphyxiation while restraining a suspect. Though it focuses on the danger of placing weight on a suspect's back while he is lying face-down, the film indicates that asphyxiation may also be caused by "hog tying" a suspect or by applying a choke hold. With respect to choke holds, the film displays a large "no sign" (a circle with a slash through it) overlaid on a photograph of a man applying a carotid sleeper choke hold. In the second portion of the film, which primarily discusses the use of O.C. spray, the narrator states that "[m]embers of the service are reminded of current department regulations that forbid choke holds, hog tying a suspect or lying, kneeling, sitting, or standing on a subject's back while trying to restrain them," while the prohibition is displayed on the screen in capital letters.

7. *See* Tr. at 609–11.

8. Interestingly, neither the Probation Department nor the Government suggested that the

The final question, then, is whether Livoti's conduct was reckless such that the base offense level for involuntary manslaughter should be 14 rather than 10. *See* U.S.S.G. § 2A1.4(a)(1) and (2). Application Note 1 to this Section, contains the following definition and guidance:

"Reckless" refers to a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation. The term thus includes all, or nearly all, convictions for involuntary manslaughter under 18 U.S.C. § 1112.[9]

 I find that Livoti was surely aware of the risks of using a choke hold and that disregarding that risk constituted a gross deviation from the standard of care that a reasonable person, indeed a reasonable police officer, would have exercised in this very non-threatening arrest situation. As already noted, Livoti appreciated the risk created by use of a choke hold because he was aware of the contents of the training film prepared by the Police Department, the October 20, 1993, Interim Order, and Patrol Guide Procedure 104–01, all of which prohibited the use of choke holds. In addition, this was not a situation that called for the use of extreme protective measures that might be required during the arrest of armed or violent criminals. For these reasons, Livoti's conduct was reckless and U.S.S.G. § 2A1.4(2) applies, requiring a base offense level of 14.

### B. The Public Official Enhancement

U.S.S.G. § 2H1.1(b)(1) provides a specific offense characteristic enhancement. This section states that "[i]f (A) the defendant was a public official at the time of the offense; or (B) the offense was committed under color of law, increase by 6 levels." The Probation Department and the Government concluded that this enhancement is warranted. Livoti, however, argues that this enhancement is not permitted because 18 U.S.C. § 242, the offense of conviction, requires a finding that the defendant acted under color of law. This section states, in pertinent part, "[w]hoever, under color of law . . . willfully subjects any person . . . to the deprivation of any rights . . . shall be guilty of a crime." 18 U.S.C. § 242. He argues that to allow the enhancement would result in impermissible double-counting, that is considering the same conduct twice.

 Livoti's argument must be rejected. In this Circuit, impermissible double counting occurs where a court considers the same factor both in setting the base offense level and in applying a special offense characteristic that enhances that level or in granting a departure from that level. *See, e.g., United States v. Hudson,* 972 F.2d 504, 506–07 (2d Cir.1992); *United States v. Campbell,* 967 F.2d 20, 23 (2d Cir.1992); *United States v. Coe,* 891 F.2d 405 (2d Cir.1989). Section 2H1.1 applies to all civil rights violations, whether or not they are committed by public officials or under color of law. For example, § 2H1.1 provides the applicable guidelines for violations of 18 U.S.C. §§ 242, 245(b), 246, 247, 248 and 1091 as well as 42 U.S.C. § 3631, none of which requires that the defendant have committed a civil rights crime in his official capacity or under color of law. Thus, the "under color of law" element is not a component of the base offense level under § 2H1.1. As a result, application of the six-level enhancement under § 2H1.1 does not constitute impermissible double counting.[10]

Court apply the Second Degree Murder Guideline found at U.S.S.G. § 2A1.1 and requiring a base offense level of 33. Livoti argues that he was not responsible for Anthony Baez's death. Alternatively, he argues that if the Courts does find that he caused the death, the proper base offense level is involuntary manslaughter.

**9.** 18 U.S.C. § 1112 defines involuntary manslaughter as the unlawful killing of a human being "[i]n the commission of an unlawful act not amounting to a felony, or in the commission

in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."

**10.** Even if the concept of double counting were expanded to prohibit a court deciding on a sentencing enhancement from considering factors that were elements of the offense of conviction, Livoti's argument would fail. The enhancement at issue here is required in either of two alternative circumstances: (1) if a defendant acted "under color of law," or (2) if he was "a public

Because Livoti acted under color of law and as a public official, a six-level enhancement is warranted pursuant to U.S.S.G. § 2H1.1(b).

## C. Obstruction of Justice

Both the Probation Department and the Government believe that a two-level increase for Livoti's obstruction of justice is warranted. U.S.S.G. § 3C1.1 provides that a sentencing court should increase a defendant's offense level "[if] the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution or sentencing of the *instant offense*" (emphasis added). Application Note 3 provides a nonexhaustive list of examples of the types of conduct to which the obstruction of justice enhancement applies which includes "committing, suborning, or attempting to suborn perjury."

 Before the perjury enhancement is applied, a court must "find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony c) as to a material matter." *United States v. Zagari,* 111 F.3d 307, 329 (2d Cir.1997). The enhancement is mandatory once its factual predicates have been established. *United States v. Friedman,* 998 F.2d 53, 58 (2d Cir.1993) (citing *United States v. Dunnigan,* 507 U.S. 87, 98, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). Obstruction of justice must be found by clear and convincing evidence. *United States v. Ruggiero,* 100 F.3d 284, 294 (2d Cir.1996). Finally, Application Note 1 to § 3C1.1 requires that conflicts as to sworn testimony claimed to be perjurious and about which the judge has no firm conviction must be evaluated in the light most favorable to the defendant.

The Government argues that the obstruction of justice enhancement is warranted because Livoti lied during his state grand jury testimony and because he offered perjured testimony in his defense. I will address both of these contentions.

### 1. Perjury Before the State Grand Jury

Livoti argues that even if he testified falsely before a state grand jury, which he denies, that testimony cannot be a basis for an enhancement of his federal sentence because the state was not investigating or prosecuting the "instant offense," as required by the plain language of U.S.S.G. § 3C1.1. For the reasons set forth below, Livoti's argument is rejected.

 First, I find by clear and convincing evidence that in light of the jury's verdict and my review of the trial record and Livoti's state grand jury testimony, Livoti committed perjury by testifying falsely on many material matters.[11] The real question, then, is whether his testimony before the state grand jury obstructed justice "during the investigation, prosecution, or sentencing of the instant offense."

The focus of this inquiry is to identify the "instant offense." While the elements of the state charges and the federal charge are obviously different, the offense in both cases

---

official" at the time of the offense. In *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), the Supreme Court held that one need not be a public official to act under color of law. Thus, the enhancement would be warranted because being a public official, which Livoti was, is not an element of the offense for which he was convicted.

11. Listing each and every perjurious statement in Livoti's grand jury testimony would be an impossible task. In summary, his version of the events surrounding the Baez incident is simply not credible in light of all the testimony adduced at the federal trial. However, some specific examples are noted to provide the flavor of that testimony: On March 9, 1995 and November 16, 1995, Livoti testified that Anthony Baez shoved him after arguing with him. Livoti's Grand Jury Testimony of March 9, 1995 ("KV") at 18; Livoti's Grand Jury Testimony of November 16, 1995 ("MT") at 17. He also testified that Henry Bothwell swung at him, KV at 19; MT at 20, and that Anthony Baez shoved him against the jeep. KV at 21–22; MT at 24. Livoti further testified that while Anthony Baez was on the ground, Baez shoved him in the face, with his open right hand and struggled with the officers who were attempting to handcuff him. KV at 23–24; MT at 66, 78. Livoti also testified that during the struggle, a young black civilian offered his assistance. KV at 24; MT at 29. Finally, Livoti testified that after being on the ground, Anthony Baez got up with the assistance of Livoti and Police Officer Robert Ball, and walked a short distance in a fatigued fashion. KV at 26; MT at 39, 67–69.

involved Livoti's attack on Anthony Baez during the course of an arrest. Thus, while the instant offense is a different crime than that prosecuted in the state case, it involved the same conduct. Livoti testified before the state grand jury in January and March of 1995. I accept, for these purposes, Livoti's contention that no federal investigation was underway at that time. Nonetheless, the false testimony related to the events surrounding the death of Anthony Baez. Thus, broadly read, perjury occurred during the investigation and prosecution of the instant offense. In addition, Livoti's false testimony was partially responsible for triggering the federal investigation, resulting in an enormous expenditure of time and money.

The best discussion of this issue is found in *United States v. Self,* 132 F.3d 1039 (4th Cir.1997). In that case, a defendant was convicted on federal firearms charges (being a felon in possession of a firearm). The underlying conduct involved a robbery and assault by the defendant and his accomplice on two elderly sisters. When arrested, the defendant was found to be in possession of a gun which had been used to pistol whip one of the sisters. While the defendant was in the custody of the local police, he solicited a fellow inmate to murder the sisters in return for a $5,000 payment.

In discussing whether the obstruction of justice enhancement could apply to these facts, the court assumed, *arguendo,* that there was no federal investigation pending at the time of the solicitation. Nonetheless, the court held that the enhancement applied.

> Section 3C1.1 draws no distinction between a federal investigation and a state investigation. It merely requires that the conduct occur during the investigation of the "instant offense." U.S.S.G. § 3C1.1. The failure of the guideline to distinguish between an investigation by federal officials as opposed to state officials undoubtedly is founded in a recognition that state officers are authorized to and frequently do investigate criminal conduct that ultimately is prosecuted under federal law. Indeed, in the initial stages of a criminal investigation, it may be anything but clear whether the conduct being investigated violates

state law, federal law, or both. Accordingly, the appropriate focus of inquiry is not whether federal officials had begun involvement with the investigation, but whether the investigation was for "the instant offense."

*Id.* at 1042–43. The court held "that the term 'instant offense' in § 3C1.1 refers to the offense of conviction including relevant conduct." *Id.* at 1044. Because the murderous solicitation occurred during the investigation of the robbery and assault, which were found to be relevant to the offense of conviction, the enhancement for obstruction of justice was upheld. *Id.*

The Second Circuit has similarly defined "instant offense." In *United States v. Perdomo,* 927 F.2d 111, 118 (2d Cir.1991), the court held that the term "instant offense" as used in § 3C1.1 means the offense of conviction. Accordingly, the "reference to conduct 'during' the investigation, prosecution, or sentencing of the instant offense means that the enhancement may not properly be imposed for obstructive conduct that preceded the commission of the offense of which the defendant was convicted." *United States v. Fernandez,* 127 F.3d 277, 283 (2d Cir.1997) (citing *Perdomo* ). Rather, the obstruction must be " 'tied to a count of conviction.' " *United States v. Cassiliano,* 137 F.3d 742, 746 (2d Cir.1998) (quoting *United States v. Sisti,* 91 F.3d 305, 314 (2d Cir.1996)).

Here, Livoti's perjured testimony before the state grand jury, relating to the circumstances surrounding Anthony Baez's death, was surely "tied to" the offense of conviction. Accordingly, this conduct obstructed and impeded the federal investigation. Therefore, an obstruction of justice enhancement in the federal civil rights charge is warranted based on Livoti's perjured testimony before the state grand jury. *See also United States v. Smart,* 41 F.3d 263 (6th Cir.1994) (approving obstruction of justice enhancement where defendant gave false name to local police, and then fled the jurisdiction, prior to commencement of federal investigation for drug trafficking); *United States v. Emery,* 991 F.2d 907 (1st Cir.1993) (approving obstruction of justice enhancement where defendant escaped from state

authorities prior to initiation of federal investigation); *United States v. Lato*, 934 F.2d 1080 (9th Cir.1991) (after his arrest by state authorities, defendant denied using false names and mailed letters instructing a witness to lie; because the federal offense of mail fraud involved the same conduct as that for which defendant was arrested by state authorities, enhancement applies); *but see United States v. Perez*, 50 F.3d 3 (7th Cir. 1995) (although recognizing that obstructive conduct during a prior state investigation may warrant enhancement for a related federal offense, enhancement denied where defendant's flight from the country during state investigation did not obstruct or impede the federal investigation).[12]

### 2. Offering Perjurious Testimony

The Government also seeks the obstruction of justice enhancement based on the fact that Livoti offered the testimony of several police witnesses who testified falsely at the federal trial. The question remains, however, as to whether this conduct, if true, amounts to an obstruction of justice.

 There is no doubt that Livoti knew what the police testimony would be because the same witnesses testified at the state trial. I further conclude that because he knew that these witnesses would testify in a manner consistent with his own version of the events, he knowingly offered false testimony.

There is clear and convincing evidence that the police witnesses called by Livoti testified falsely. They each testified that Anthony Baez was conscious, moving and resisting their efforts to handcuff him, at a time that he was, in fact, unconscious as a result of the choke hold applied by Livoti. *See* Testimony of Sergeant William Monahan ("Monahan Tr.") at 889–93; Testimony of Anthony Farnan ("Farnan Tr.") at 992; Testimony of Mario Erotokritou ("Erotokritou Tr.") at 1254, 1257–59. Police officers also falsely testified that after he was handcuffed, Baez, with assistance from Livoti, got to his feet and took a few steps. *See* Monahan Tr. at

908–11; Erotokritou Tr. at 1204–11. The application of the choke hold, and the fact that it rendered Baez unconscious, were amply proven by the medical testimony, the testimony of the Government's civilian witnesses, and the rebuttal evidence provided by two police officers. *See generally,* Testimony of Dr. Hirsch, the Baez brothers and Yvette Rodas, and Officers Robert Ball and Daisy Boria. *See also* Government's Sentencing Memorandum at pp. 16–20. Most disturbing, however, was the incredible testimony of two defense witnesses that an unidentified black or Hispanic civilian, unobserved by anyone else at the scene, momentarily joined in a struggle to subdue Anthony Baez on the ground. *See* Monohan Tr. at 898–900; Farnan Tr. at 975–76.

This does not mean, however, that Livoti suborned perjury. " 'Subornation of perjury consists in *procuring or instigating* another to commit the crime of perjury.' " *Petite v. United States of America*, 262 F.2d 788, 794 (4th Cir.1959) (quoting 70 C.J.S.1951 Perjury § 79). In *Petite,* the Fourth Circuit upheld the following jury charge:

Now, let me break it down. Knowledge of how the witness will testify does not make a defendant guilty. On the other hand, a defendant may be guilty without having instructed the witness what to say.

A lawyer may be guilty of subornation of perjury even though he has not instructed the witness to say so if he knows that the testimony the witness is going to give is false and if he knows that the witness knows that it is false and yet he *causes or induces the witness to do it and puts the witness on the stand,* and the witness does so testify; then the defendant may be guilty.

But mere knowledge of how the witness will testify is not of itself sufficient to make him guilty. He must, with the language I gave you, cause or induce.

*Petite,* 262 F.2d at 796 (emphasis added). Accordingly, there must be some affirmative act of procurement, in addition to merely

---

**12.** In addition to *United States v. Perez, supra,* Livoti also cites *United States v. Gacnik,* 50 F.3d 848 (10th Cir.1995). However, this case is distinguishable. In *Gacnik,* the court held that at the time of the obstructive conduct (hiding explosives), the defendant was unaware of *any* investigation of the offense of conviction.

calling the witness to stand, to support an enhancement for subornation of perjury.[13]

Here, there is no evidence that Livoti did anything more than call the perjuring witnesses to the stand in aid of his defense. In the absence of evidence that Livoti did anything more to procure or instigate the perjury, he cannot be found to have suborned perjury. This is not to say, however, that the obstruction of justice enhancement is not warranted. In *United States v. Noland*, 960 F.2d 1384 (8th Cir.1992), the Eighth Circuit upheld the trial court's finding of obstruction where the defendant elicited false testimony from her two minor children. Although the defendant contended that "there was no evidence that she suborned such perjury," the court held that the "solicitation of false testimony generally may be viewed as an obstruction of justice." *Id.* at 1391 (citing *United States v. Lange*, 918 F.2d 707, 709 (8th Cir. 1990)). Although Livoti may not be guilty of suborning perjury because he did not procure the false testimony, the obstruction of justice enhancement still applies because he solicited the false testimony by calling the officers to the stand.

IV. Basic Principles Governing Departures

 I will not here address the substance of the defense or Government motions for downward or upward departures, respectively. It is, however, useful simply to review the basic principles governing departures. It is axiomatic that departures from the guideline range are appropriate only if the case is atypical or outside of the heartland, that is the set of typical cases embodying the conduct that each guideline describes. *See Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Rogers*, 972 F.2d 489, 493 (2d Cir. 1992). Instances are "atypical" if "they vary by reason of degree of seriousness, or frequency of occurrence, from the norm" and may justify an upward or downward departure. *United States v. Ventura*, 146 F.3d 91, 91 (2d Cir.1998). Finally, "[a] district court's decision to depart from the Guidelines ...

will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Koon*, 518 U.S. at 98, 116 S.Ct. 2035.

---

**13.** One court, however, has held that mere silence can qualify as an affirmative act. *See Tedesco v. Mishkin*, 629 F.Supp. 1474, 1480, 1482 (S.D.N.Y.1986) (after hearing client's proposed false testimony, silence by attorney was understood to indicate agreement and was "tantamount to complicity," district court found that attorney had suborned perjury).