**UNITED STATES of America,
Appellee,**

v.

**Edward VELAZQUEZ, Joseph Bergen,
and Patrick Regnier, Defendants–
Appellants.**

Docket Nos. 00–1386(L), 00–1407(CON)
and 00–1425(CON).

United States Court of Appeals,
Second Circuit.

Argued Dec. 7, 2000.

Decided April 12, 2001.

Lawrence V. Carra', Mineola, N.Y. (Dennis M.M. Lemke, Mineola, N.Y., on

the brief), for defendant-appellant Velazquez.

Richard J. Barbuto, Mineola, N.Y. (Alyse Wolfson, paralegal, Mineola, N.Y., on the brief), for defendant-appellant Bergen.

Peter J. Tomao, Garden City, N.Y., on the brief, for defendant-appellant Regnier.

Sanford M. Cohen, Asst. U.S. Atty., Brooklyn, N.Y. (Loretta E. Lynch, U.S. Atty., Emily Berger, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Before: NEWMAN, CABRANES, and STRAUB, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal by three prison guards convicted of civil rights violations concerns an outrageous episode in which two of the guards severely beat a prisoner, causing his death, and a third guard participated in a cover-up of the beating. The principal issue is whether the "underlying offense," U.S.S.G. § 2H1.1(a)(1), for purposes of sentencing the two guards who committed the fatal assault was voluntary manslaughter, as found by the District Court; involuntary manslaughter, as urged by the Appellants; or second-degree murder, as suggested by the Government. That issue also concerns the sentence of the third guard, who was convicted of being an accessory after the fact. Edward Velazquez, Patrick Regnier, and Joseph Bergen appeal from judgments entered in the United States District Court for the Eastern District of New York (Jacob Mishler, District Judge), convicting them of violating 18 U.S.C. §§ 241, 242. Velazquez and Regnier pled guilty; Bergen was convicted after a jury trial. Bergen challenges his conviction; all three Appellants challenge their sentences.

We conclude that Bergen's conviction should be affirmed and that the sentences of all three Appellants must be vacated, primarily because the District Court mischaracterized the mental states distinguishing murder from voluntary manslaughter. We therefore remand for resentencing.

## Facts

Since the facts bear both on Bergen's claim that the evidence was insufficient to support the jury's verdict and on all the Appellants' challenges to their sentences, we set them forth in some detail, recounting them in a light favorable to both the jury's verdict in Bergen's case and Judge Mishler's sentencing findings as to all three Appellants.

### 1. The Assault and Aftermath

Thomas Pizzuto, aged 38, was sentenced to Nassau County Correctional Center (NCCC) for 90 days, for driving under the influence of methadone. Pizzuto, a recovering heroin addict, was placed in a cell on the "Observation Tier," used to house prisoners for their first three days in confinement until their assignment to general population. On his first full day in jail, he complained to any who would listen that he needed methadone. When the prisoners on the Observation Tier were let out of their cells for a brief interval after lunch, Pizzuto asked two corrections officers, including Defendant–Appellant Velazquez, for methadone. Velazquez told Pizzuto to "shut the fuck up" and to get out of the shower area. Pizzuto responded, "Fuck you, you are not going to tell me what to do." Velazquez then ordered all the inmates back to their cells. They all complied, including Pizzuto, who paused for just "[a] couple of seconds" before entering his cell as ordered.

Velazquez told his immediate supervisor, Gary Pincus, that Pizzuto had not immediately heeded the order to return to his cell,

and said he would "pay him a visit." He and another corrections officer, Defendant–Appellant Regnier, then put on rubber surgical gloves (the required practice in the NCCC when officers might come into contact with inmates), opened the security gate, and entered the inmate walkway. Pincus directed another officer, Ivano Bavaro, to join them. Bavaro, who later signed a cooperation agreement, testified at the trial about what happened next.

Velazquez and Regnier entered Pizzuto's cell, with Bavaro remaining at the cell opening as a look-out. Pizzuto was sitting on his bunk. A brutal beating ensued. Velazquez punched Pizzuto in the eye with a closed fist, pushed him into a prone position, and continued punching him. At the same time, Regnier punched Pizzuto in the lower part of his back and kneed him on his lower back and legs. Pizzuto never fought back. The beating lasted for about one minute. Pizzuto was left moaning in his cell. After the beating, Velazquez and Regnier boasted about the "good shots" each had. "gotten in."

A short while later, Defendant–Appellant Bergen came on duty; he was then a corporal (supervisor) at the NCCC. It fell to Bergen to write the required report about Pizzuto's injuries. Pincus told Bergen about the incident, and Bergen asked, "Do you want me to write a report to cover you guys up"? Velazquez informed Bergen that a prisoner had cursed at Velazquez and that "we went down and took care of him." Pincus told Bergen, "My guys had a problem with D–3 [the Observation Tier]. And they smacked him around a little." Later that day, Bergen stopped in front of Pizzuto's cell and asked him which inmates had injured him. Pizzuto answered that it was "your guys," i.e., corrections officers.

Later that afternoon, Bergen told Pincus that Pizzuto had told Bergen that he had slipped and fallen in the shower. Bergen said he would write a report about the slip and fall. He prepared a false report, attributing Pizzuto's injuries to a slip and fall, and got Pizzuto to sign the report.

Pizzuto then walked on his own power to the NCCC Medical Unit, was treated for minor injuries, and then returned the same night to his cell. No serious damage was discovered on this visit to the doctor, although Pizzuto was badly bruised on his back and face. These bruises would become particularly gruesome, since Pizzuto was generally in poor health, with a low platelet count, which caused him to bruise easily.

Three days later, Pizzuto collapsed in his cell. Until this point, he had shown no ill effects from the assault, apart from the bruises, which had been getting bigger and more discolored. After regaining consciousness, Pizzuto was taken by ambulance to the hospital, where a CAT scan revealed that his spleen was either lacerated by the assault or infracted (i.e., contained dead tissue for reasons unrelated to the assault). The doctor who examined Pizzuto opined that the spleen was probably lacerated by the assault, because of the bruise on the victim's body in the area over the spleen. Pizzuto spent two nights in the intensive care unit, and was then declared fit to return to the jail's normal medical center. A few hours after his return to the center, and five days after being assaulted, Pizzuto collapsed again. He was found naked, unconscious, and without a pulse on the ward-room floor of the medical center. CPR was administered, but he died without ever regaining consciousness.

The Nassau County Medical Examiner, who performed an autopsy, determined that Pizzuto died from internal bleeding

due to a ruptured spleen. The spleen rupture did not occur until just before Pizzuto's death, but was caused, the medical examiner concluded, by a blunt force injury sustained three to seven days before death. The medical examiner declared the death a homicide. In his opinion, Pizzuto's final collapse and death resulted from the spleen rupture, which resulted from the beating.[1] A forensic pathologist for the defense agreed that the death was caused by the rupture of Pizzuto's spleen "due to blunt force trauma." He also opined that the spleen had become enlarged to five or six times normal weight because of liver disease and that "[w]hen a spleen becomes abnormally enlarged, it will be unprotected and at risk for injury even from a minor blunt force impact."

2. The Indictments, the Trial, and the Sentencing

The indictment charged Regnier and Velazquez with violating 18 U.S.C. §§ 241 and 242 by depriving Pizzuto of his right "not to be subjected to cruel and unusual punishment, by one acting under color of law, resulting in bodily injury and death." Sections 241 and 242 provide that, if death results from the acts that violate these statutes, the maximum punishments are life imprisonment or the death penalty. Bergen was indicted as an accessory after the fact under 18 U.S.C. § 3, which specifies a maximum penalty of fifteen years if the maximum punishment for the accessory's principal is life imprisonment or the death penalty.

Regnier and Velazquez pled guilty; Bergen went to trial. At their plea allocutions, Regnier and Velazquez initially gave evasive answers when asked whether their conduct "resulted in" Pizzuto's death, as the indictments alleged. After Judge Mishler began to express doubts that the allocutions would support the guilty pleas, both Regnier and Velazquez conceded that their conduct resulted in Pizzuto's death.

At Bergen's trial, he admitted the assault and its causal connection to Pizzuto's death, but unsuccessfully tried to persuade the jury that his report truthfully reflected the circumstances that he believed to have existed.

At the sentencing of all three Appellants, Judge Mishler turned initially to U.S.S.G. § 2H1.1, which instructs a judge sentencing for criminal violations of civil rights to apply "the offense level from the offense guideline applicable to any underlying offense." *Id.* § 2H1.1(a)(1). The Government contended that the underlying offense was second-degree murder, *see* 18 U.S.C. § 1111(a) (any killing with "malice aforethought" not within statutory circumstances constituting first-degree murder), for which the base offense level is 33. *See* U.S.S.G. § 2A1.2. The Defendants contended that the underlying offense was involuntary manslaughter, *see* 18 U.S.C. § 1112(a) (unnumbered third paragraph), for which the base offense level is 10 (criminally negligent conduct) or 14 (reckless conduct), *see* U.S.S.G. § 2A1.4, or minor assault, for which the base offense level is 6, *id.* § 2A2.3(1) (physical contact). Adopting the Probation Department's recommendation, Judge Mishler ruled that the appropriate underlying offense was voluntary manslaughter, *see* 18 U.S.C. § 1112(a) (second unnumbered paragraph), for which the base offense level is 25. *See* U.S.S.G. § 2A1.3.

---

1. At sentencing, the Appellants contended that Pizzuto's final collapse might have been the result of a seizure unrelated to his lacerated spleen, and that the fatal spleen rupture might have occurred as a result of improperly administered CPR.

Because Judge Mishler's reasons for identifying voluntary manslaughter as the underlying offense are critical to this appeal, we set forth his written explanation:

> Second degree murder requires a finding that the defendant killed the victim "with malice aforethought." 18 U.S.C. § 1111(a). Manslaughter, on the other hand, is the unlawful killing of a human being without malice. 18 U.S.C. § 1112(a). Voluntary manslaughter is committed "upon a sudden quarrel or heat of passion." *Id.*

> Malice is the state of mind that would cause a person to act without regard for the life of another. I do not believe that Defendants Velazquez and Regnier acted with such intent when they entered Pizzuto's cell on January 8. The more appropriate classification for Defendants' actions is voluntary manslaughter under § 1112(a). In determining whether a defendant acted in the "heat of passion" for purposes of § 1112(a),

> "the basic inquiry is whether or not at the time of the killing, the reason and judgment of the defendant was obscured or disturbed by passion ... to such an extent as would cause an ordinarily reasonable person of average disposition to act rashly and without deliberation and from passion rather than judgment".

> *United States v. Livoti,* 22 F.Supp.2d 235, 243 (S.D.N.Y.1998) (citing 2 Leonard B. Sand et al., *Modern Jury Instructions* ¶ 41.02 at 41–46, 47).

> I find that Velazquez and Regnier acted in response to Pizzuto's refusal to obey their commands and the abusive epithets directed to them. I find that Velazquez and Regnier acted in the heat of passion and that Pizzuto's conduct was sufficient to arouse the passion of a reasonable man.

Accordingly, Defendants' conduct is classified as voluntary manslaughter and carries a base offense level of 25.

For Regnier and Velazquez, Judge Mishler added 6 levels for acting under color of law, *see id.* § 2H1.1(b)(1), 2 levels for vulnerability of the victim, *see id.* § 3A1.1(b)(1), and 2 levels for obstruction of justice, *see id.* § 3C1.1, and subtracted 2 levels for acceptance of responsibility, *see id.* 3E1.1(a). The resulting adjusted offense level of 33 in Criminal History Category I yielded a sentencing range of 135 to 168 months. Judge Mishler sentenced Velazquez and Regnier to 135 months (concurrently on both counts).

For Bergen, Judge Mishler added the same six-level "color of law" and the two-level "vulnerable victim" adjustments that the co-defendants received, and subtracted 6 levels because Bergen was an accessory after the fact, *see* § 2X3.1(a). In Criminal History Category I, the adjusted offense level of 27 yielded a sentencing range of 70 to 87 months. Judge Mishler sentenced Bergen to 70 months.

In sentencing all three defendants, the District Judge implicitly rejected their requests to depart because of family circumstances.

### Discussion

#### I. Bergen's Claims of Error at Trial

##### A. Admission of Photos

At Bergen's trial, the Government introduced autopsy photos showing the extent of Pizzuto's bruising, and invited fourteen witnesses to comment on them. Bergen contends that this use of the photos was more prejudicial than probative, in violation of Fed.R.Evid. 403, especially because he offered to stipulate that the assault occurred.

■ In limited circumstances, the Government can be required to accept a stipulation by the defendant to a particular fact, rather than present evidence proving the stipulated fact. In *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), the Court ruled that, because the defendant was willing to stipulate to the fact of his prior conviction, it was error to admit evidence detailing the prior offense, even though the prior conviction was an element of the pending gun possession charge. The Court noted that the Government generally has a right to present evidence of a fact that a defendant would prefer to admit, so as to establish the "human significance" of the fact and "to implicate the law's moral underpinnings." *Id.* at 187–88, 117 S.Ct. 644. The Court recognized an exception, however, "when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." *Id.* at 190, 117 S.Ct. 644. The Court emphasized that the evidence of Old Chief's prior offense was highly prejudicial (potentially luring a jury to convict based on character rather than conduct), and did not fill a "gap in the story of a defendant's subsequent criminality." *Id.* at 191, 117 S.Ct. 644.

Bergen claims that his case is like *Old Chief* because he was willing to stipulate that the beating occurred and the photos invited the jury to convict him based on revulsion at what was done to Pizzuto. We disagree. First, although the details of the prior offense were irrelevant to the defendant's culpability in *Old Chief,* in the pending case the extent of Pizzuto's injuries established that cruel and unusual punishment had occurred, and underscored the moral blame attaching to Bergen's decision to cover up the crime. The photos also helped to resolve a disputed point at the trial—that Pizzuto's signature

on Bergen's cover-up report was coerced by the beating he had just received. Thus, unlike the details of the prior conviction in *Old Chief,* details of Pizzuto's injuries were legally and morally relevant to the conduct constituting the offenses committed by Bergen's principals. Judge Mishler did not exceed his discretion in admitting the photos. *See United States v. Salameh,* 152 F.3d 88, 122–23 (2d Cir.1998) (no abuse of discretion to admit a "significant" number of "graphic" and "disturbing" photos of World Trade Center bombing victims, including corpse of a pregnant woman, despite defendants' stipulation offer).

**B. Sufficiency of the Evidence to Support Bergen's Conviction**

■ Bergen contends that the evidence was insufficient to support his conviction. His specific point is that the Government did not prove that he knew his injury report (which claimed that Pizzuto fell in the shower) was false. This claim lacks merit. Inmates and other corrections officers testified that Bergen falsified his report. The inmates heard Pizzuto tell Bergen, "your guys did this" on the day of the assault. The corrections officers also testified that Bergen knew from the start that Pizzuto had been assaulted, and that Bergen volunteered to cover it up.

**II. Appellants' Sentencing Claims**

The Appellants and the Government agree that the appropriate sentences for Velazquez and Regnier as principals and for Bergen as an accessory depend on identification of the "underlying offense" committed by Velazquez and Regnier. *See* U.S.S.G. § 2H1.1(a)(1). They also agree that Judge Mishler erred in identifying voluntary manslaughter as the appropriate underlying offense. Their shared opposition to his selection of voluntary manslaughter is based on their agreement that

the evidence does not support a finding that the assailants acted in the heat of passion. However, the parties make entirely different arguments as to the consequences that would follow if we were to accept their view that the assailants did not act in the heat of passion. The Appellants contend that the appropriate underlying offense should have been involuntary manslaughter or minor assault, offenses carrying lower base offense levels. The Government contended in the District Court that the underlying offense should have been second degree murder, an offense carrying a higher base offense level. In this Court, the Government reiterates its view that the evidence supports a finding, as a matter of fact, *see* Brief for Appellee at 43, and perhaps of law, *see id.* at 44 n. 10, that the assailants acted with malice, not negated by heat of passion, but then contents itself with urging only that the sentences based on voluntary manslaughter should be affirmed. *See id.* at 36. Resolving these competing claims usefully begins with careful consideration of Judge Mishler's explanation for selecting voluntary manslaughter.

Judge Mishler's first step was to define malice as "the state of mind that would cause a person to act *without regard for the life of another,*" Sentencing Memorandum at 5 (emphasis added). Next, Judge Mishler stated, "I do not believe Defendants Velazquez and Regnier acted with *such intent* when they entered Pizzuto's cell on January 8." *Id.* (emphasis added). Immediately thereafter he concluded, "The more appropriate classification for Defendants' actions is voluntary manslaughter," *id.* at 5–6, which he deemed appropriate because he found that "Velazquez and Regnier acted in the heat of passion and that Pizzuto's conduct was sufficient to arouse the passion of a reasonable man." *Id.* at 6. This explanation raises three related questions: (1) Did Judge Mishler

mean that Pizzuto's assailants lacked the mental state of malice, irrespective of whether they acted in the heat of passion, or that their mental state would have been malice had that mental state not been displaced by heat of passion? (2) Did Judge Mishler use the correct standard for determining the existence of heat of passion? (3) Did Judge Mishler use the correct standard for determining the existence of malice?

### A. Independence of the "No Malice" Finding

■ On the initial question of whether the "no malice" finding is independent of the "heat of passion" finding, the Judge's explanation is ambiguous. He might have meant that the assailants acted without malice, whether or not they acted in the heat of passion. On the other hand, he might have meant that the heat of passion displaced the state of mind that would otherwise have been malice. In view of his ultimate conclusion that the appropriate underlying offense was voluntary manslaughter, the latter interpretation of his explanation is arguably more likely, because "[w]hile voluntary manslaughter requires *a mental state that would be malice except for heat of passion* or provocation, involuntary manslaughter requires only the lesser mental state of gross negligence." 2 Sand *et al., Modern Federal Jury Instructions* ¶ 41.02, at 41–52 (2000) (emphasis added) [hereinafter "Sand"]; *see United States v. Roston,* 986 F.2d 1287, 1291 (9th Cir.1993) (heat of passion "negate[s] the presence of malice"); *United States v. Browner,* 889 F.2d 549, 552 (5th Cir.1989) (same). However, we cannot be certain which of the two possible interpretations Judge Mishler intended. Moreover, because the Judge's findings with respect to both heat of passion and malice (whether made independently or in rela-

tion to each other) are vulnerable to serious legal challenge, this ambiguity needs to be resolved on remand, once the legal infirmities in the two findings have been considered and, if possible, remedied.

### B.  The Standard for Heat of Passion

■ Judge Mishler's finding that the assailants acted in the heat of passion appears to be based on the fact that, as he noted, they "acted in response to Pizzuto's refusal to obey their commands and the abusive epithets directed to them." These circumstances do not suffice to support a "heat of passion" finding. At common law, heat of passion could not be shown by words alone, no matter how provocative. *See* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.10(b)(6), at 260 & 260 n. 55 (2d ed.1986) [hereinafter "LaFave & Scott"]. At least one circuit has followed this approach with federal offenses. *See United States v. McRae,* 593 F.2d 700, 705 (5th Cir.1979). Although in some jurisdictions, insulting words have been deemed sufficient provocation to reduce murder to manslaughter, *see People v. Morales,* 179 Misc.2d 324, 684 N.Y.S.2d 853 (Sup.Ct. Kings Cty.1999), the prevailing view has been that words can engender heat of passion only if the words impart information of a highly provocative nature. *See* LaFave & Scott, § 7.10(b)(6), at 260. The classic example is one spouse informing the other spouse of the former's infidelity, which provokes the recipient of the information to kill the adulterer. *See id.* Pizzuto's cursing at Velazquez imparted no information, and his isolated use of the same expletive Velazquez had directed at him will not suffice for a "heat of passion" finding. *See State v. Hale,* 453 N.W.2d 704, 707 (Minn.1990) (victim's insults insufficient to provoke ordinary person to kill).

Nor, in the circumstances of this case, can Pizzuto's momentary refusal to obey Velazquez's command to reenter his cell constitute sufficient provocation for a heat of passion defense. Although appropriate force sometimes may have to be used to secure compliance with legitimate commands within a prison, Pizzuto was already in his cell when the fatal beating was administered. Force was not used to obtain compliance with a disregarded command; it was summary punishment for previous (and momentary) disobedience.

■ Furthermore, Judge Mishler's finding is vulnerable to the extent that it rested on his view that Pizzuto's conduct "was sufficient to arouse the passion of a reasonable man." Just as law enforcement officers are entitled to have their conduct insulated from liability by assessing the circumstances confronting them through the eyes of a reasonable officer, *see Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), they must expect to have their actions assessed by the standards of a reasonable officer when liability is sought to be imposed. It is doubtful that Pizzuto's conduct sufficed to arouse the heat of passion of a reasonable corrections officer confronting a prison inmate. *Cf. United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990) ("[M]ere words by a pretrial detainee [cannot] justify the use of physical force by a police officer.").

■ Finally, we note that the "heat of passion" defense is normally unavailable after some interval of time has elapsed between the provocation and the response. *See* LaFave & Scott, § 7.10(d), at 265. In the pending case, that interval included sufficient time for the assailants to inform their supervisor about Pizzuto's conduct and to don rubber gloves (as a precaution against HIV infection) before entering his cell to beat him.

Although one member of the panel believes that as a matter of law the evidence is insufficient for a "heat of passion" finding, we will leave the matter for further consideration on remand because the possibility exists, however remote, that more precise findings, possibly made on an amplified record, could support such a finding.

### C. The Standard for Malice

■ If, on remand, Judge Mishler clarifies that he would have found malice had that state of mind not been displaced by heat of passion, and if a valid finding of heat of passion is not made, the question wil' then arise as to the proper standard for determining malice for purposes of distinguishing second-degree murder from involuntary manslaughter. Judge Mishler correctly ruled that the assailants could not be punished for second-degree murder unless the evidence established that they acted "with malice aforethought." 18 U.S.C. § 1111(a). Without proof of malice, their underlying offense would be, at most, manslaughter (either voluntary or involuntary). *See id.* § 1112(a). However, in defining "malice" as "the state of mind that would cause a person to act without regard for the life of another," Judge Mishler may have used an incomplete standard.

■ Two aspects of his formulation are of concern. First, the standard is usually expressed in terms that convey some heightened degree of disregard for human life. For example, the Tenth Circuit has stated, "Second-degree murder involves reckless and wanton disregard for human life that is extreme in nature, while involuntary manslaughter involves reckless and

wanton disregard that is not extreme in nature." *United States v. Wood,* 207 F.3d 1222, 1229 (10th Cir.2000). Judge Sand's model instruction recommends informing a jury that to establish the malice required for second-degree murder, the Government needs to prove "reckless and wanton conduct on the part of a defendant which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death." 2 Sand, ¶ 41.01, at 41–13. Profs. LaFave and Scott state, "Extremely negligent conduct, which creates what a reasonable man would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others—though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another, may constitute murder." LaFave & Scott, § 7.4, at 200.[2] The Model Penal Code suggests that a reckless killing is murder only if done "under circumstances manifesting extreme indifference to the value of human life." *Model Penal Code* § 210.2(1)(b) (Proposed Official Draft 1962).

■ Second, in the context of second-degree murder in federal law, the requisite malice can in some circumstances be found when the assailant acts with awareness of " 'a serious risk of death *or serious bodily harm.'* " *United States v. Milton,* 27 F.3d 203, 206 (6th Cir.1994) (emphasis added) (quoting *United States v. Black Elk,* 579 F.2d 49, 51 (8th Cir.1978)); *see Wood,* 207 F.3d at 1228 (" '[S]econd degree murder's malice aforethought element is satisfied by: ... (2) intent-to-do-serious-bodily-injury ....' ") (quoting *United*

---

2. Although we agree with these authors that there must be a heightened degree of disregard for life, we do not endorse their view that a distinction should be drawn between a "very high degree of risk" and a "high degree of risk." LaFave & Scott, § 7.4, at 200. The substantive standard must be explicable to juries, and there are limits to what subtle distinctions in the wording of a jury instruction can realistically be comprehended.

States v. Pearson, 159 F.3d 480, 486 (10th Cir.1998)); United States v. Fleming, 739 F.2d 945, 948 (4th Cir.1984) ("without regard for the life and safety of others") (emphasis added).[3] An intent to cause a serious risk of a serious injury will frequently suffice to demonstrate a heightened disregard for human life, although a fact-finder might in some circumstances conclude that such intent does not indicate the malice required for second-degree murder.

In particular, an inference of malice might not be appropriate where the victim is assaulted and dies substantially as a result of his unusual and unforeseeable fragility, such as a thin skull or hemophilia. For example, in United States v. Livoti, 22 F.Supp.2d 235 (S.D.N.Y.1998), the victim's asthma condition made him especially vulnerable to injury (and resulting death) from a police officer's use of a choke hold to subdue the victim. The officer's offense was classified as involuntary manslaughter. Id. at 245–46. See also LaFave & Scott, § 7.13(d), at 296 ("[I]t is almost universally held ... that one is guilty of involuntary manslaughter who intentionally inflicts bodily harm upon another person, as by a moderate blow with his fist, thereby causing an unintended and unforeseeable death to the victim (who, unknown to his attacker, may have a weak heart or a thin skull or a blood deficiency)."). Of course, a beating that causes the death of an especially vulnerable victim might well permit a finding of malice if the evidence shows that the extent of the beating would have posed such a serious risk of serious injury to an average person as would demonstrate the assailant's heightened disregard for human life.

In the pending case, if, on remand, voluntary manslaughter is rejected because heat of passion cannot be validly found under the applicable standard, the choice between second-degree murder and involuntary manslaughter will turn on how great a risk of serious bodily injury Pizzuto's assailants could reasonably apprehend would result from their assaultive conduct and what that risk reveals about the degree of their indifference to Pizzuto's life. On this issue, if it arises, further findings will be needed. In particular, it will be necessary to determine whether there was a substantial risk that the repeated punching and kicking administered by Velazquez and Regnier would inflict serious bodily injury on an average adult, sufficient to infer an extreme indifference to human life, or whether the resulting laceration of Pizzuto's spleen occurred primarily because it was enlarged five or six times normal weight, a circumstance that was not reasonably foreseeable.

## III. The Remedy

Having concluded that the finding of voluntary manslaughter as the underlying offense cannot stand on the basis of the subsidiary findings and explanation thus far provided by the District Court, we deem it appropriate to give some preliminary consideration to the remedy. Clearly, a remand is warranted to afford the District Court an opportunity to eliminate, if possible, the legal infirmities we have identified. What is less clear is whether, on remand, Judge Mishler should be permitted to increase the Appellants' sentences based on a finding that the appropriate underlying offense is second-degree murder, or instead must be limited to ei-

---

**3.** The category of "intent-to-do-serious-bodily-injury" murder derives from English law, see LaFave & Scott, § 7.3, at 197, and the modern criminal codes of many states do not explicitly include this category, see id. at 198 n. 5 (collecting statutes), although it is explicitly retained in some jurisdictions, see id. (collecting statutes).

ther reinstating punishments based on voluntary manslaughter or sentencing for some lesser offense. We invited the parties to submit supplemental papers on this issue. The Government contends that upon remand, a *de novo* sentencing can occur at which increased sentences may be imposed. The Appellants respond that increased sentences are precluded by the Double Jeopardy Clause, at least in the absence of a cross-appeal by the Government.

The issue is not free from doubt. The Appellants appear to be correct that we have thus far permitted an increased punishment, in the absence of a Government's successful appeal of a sentence, only in circumstances significantly distinguishable from the pending case. For example, we have permitted an increased sentence after an appellant has successfully challenged one component of a sentence on a particular count, *see United States v. Young*, 932 F.2d 1035, 1037–38 (2d Cir.1991) (fine permitted after restitution order vacated), has successfully challenged a sentence on one of what we regarded as "fungible" counts, *see United States v. Gelb*, 944 F.2d 52, 58–60 (2d Cir.1991) (income tax counts), or has successfully challenged a sentence that was part of a package of sentences on related counts, *see United States v. Diaz*, 778 F.2d 86, 88–89 (2d Cir.1985) (increase permitted of sentence imposed "underneath" invalidated consecutive sentence); *cf. United States v. Pisani*, 787 F.2d 71, 75–76 (2d Cir.1986) (rejecting Government's attempt, in absence of cross-appeal, to obtain increased sentence on mail fraud count after defendant successfully appealed sentence on other mail fraud and tax counts). No case appears to have presented the issue of whether, in the absence of a Government cross-appeal, an increased sentence is permissible after a remand to permit the sentencing judge to reconsider a sentence, even though the defendant has

not been successful in obtaining a final reversal of a sentence on at least one count or a component of a sentence.

On the other hand, the Government argues with considerable force that the Supreme Court, in explicating the Double Jeopardy limitation on increased punishment after an appellant's successful appeal, has emphasized that the limitation is based on the need to avoid an opportunity for vindictiveness on the part of the sentencing judge. *See Alabama v. Smith*, 490 U.S. 794, 798–800, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). In the pending case, where a sentence is vacated because of legal vulnerabilities in the fact-finding, the risk of vindictiveness appears to be absent.

Apart from any Double Jeopardy limitation, an increased sentence might also encounter the objection that the Government, as the Appellee, cannot obtain more "relief" than it obtained in the original judgments in the absence of a cross-appeal. The usual statement of the applicable principle is that an "appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below." *United States v. American Railway Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *see also United States v. Lieberman*, 971 F.2d 989, 996 n.5 (3d Cir.1992) ("a party may not seek more extensive relief on appeal than it received in district court without filing a cross-appeal"). However, in our case, the Government is not "attack[ing] the decree"; it is simply contending that *if* the "heat of passion" and the "no malice" findings are erroneous, the proper remedy is to remand for *de novo* sentencing, which can include sentencing for second-degree murder. The requirement of a cross-appeal is arguably

a limitation only on the power of an appellate court to grant enhanced relief to the appellee, rather than on the power of a district court to enter on remand a judgment more favorable to the appellee.[4]

The uncertainty attending the issue of whether enhanced sentencing is available, and the fact that whether this issue will arise at all depends on the outcome of proceedings on remand, persuade us not to make any definitive ruling at this time with respect to the availability of increased punishments. However, we deem it appropriate (and the Government agrees) to afford the Appellants the opportunity to withdraw their appeals because of the distinct risk that their "victory" in having their sentences vacated might ultimately result in increased sentences. *See United States v. Showerman*, 68 F.3d 1524, 1529 (2d Cir.1995); *Bohn*, 959 F.2d at 395. We will therefore stay issuance of the mandate for 30 days to afford the Appellants an opportunity to inform the Clerk within that time whether they wish to withdraw their pending appeals.

IV. Bergen's Sentencing Claim

■ In supplemental papers submitted in response to our invitation, Bergen, the only Appellant whose guilt was determined by a jury, presented a sentencing issue arising under the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Apprendi*, the Court ruled that the jury must determine any fact (other than facts concerning a defendant's prior record) that will be used at sentencing to enhance a sentence above the statutory maximum that would apply if the fact was not established. In Apprendi's case, the fact that his crime was motivated by bias had been used to enhance his sentence above the maximum otherwise specified for his offense. Bergen's sentencing claim requires consideration of the penalty provisions of the statutes under which his principals, Velazquez and Regnier, were convicted upon their pleas of guilty.

Sections 241 and 242 contain intermediate maximum penalties. *See United States v. Garcia*, 240 F.3d 180 (2d Cir. 2001) (intermediate maximum penalties for food stamp violations). The intermediate maximum sentence for a section 241 violation is ten years; if the violation causes the death of the victim, the maximum increases to life imprisonment or the death penalty. The intermediate maximum sentence for a section 242 violation is one year; if the violation causes bodily injury, the intermediate maximum increases to ten years; if the violation causes death (or if the violation involves other serious misconduct), the maximum increases to life imprisonment or the death penalty. Bergen's maximum sentence under the accessory statute depends on the maximum available for his principals: if they face a maximum of life, his maximum as an accessory is 15 years, *see* 18 U.S.C. § 3; otherwise, his maximum is one-half of the maximum they face, *see id.* If, in this case, the principals' maximum is ten years under section 241 and one year under section 242, then a further issue arises as to how Bergen's maximum is to be determined.

The Government contends, and, thus far Bergen has not disputed, that if the ten- and one-year intermediate maximums ap-

4. An appellee can normally avoid any doubt about the propriety of obtaining enhanced relief by filing a conditional cross-appeal, explicitly preserving its right to urge any position augmenting a judgment in the event that an appellant succeeds in having the judgment vacated. However, we have cautioned against imposing a requirement that could lead to a profusion of "reflexive" cross-appeals. *See United States v. Bohn*, 959 F.2d 389, 392–94 (2d Cir.1992).

ply to Bergen's principals, the proper calculation under his one count of violating section 3 is to combine the ten- and one-year maximums for a total of eleven years (on the theory that the principals could receive consecutive sentences) and to set Bergen's maximum at one-half of the total. On that approach, Bergen's maximum would be five and one-half years, or 66 months, which is four months less than his current 70–month sentence.

However, it is open to question whether section 3 permits a cumulation of the principal's maximum sentences on multiple counts before the one-half fraction is applied to determine the accessory's maximum sentence. Although section 3 specifies that the accessory "shall be imprisoned for not more than one-half the maximum term of imprisonment ... prescribed for the punishment of the principal," it also specifies that "if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned for not more than 15 years." Presumably Congress viewed offenses punishable by life imprisonment or death as more serious than those punishable by a term of years, yet the Government's approach of cumulating the principal's maximum sentences would permit an accessory to a principal's capital offense to receive less punishment than an accessory to a principal's commission of two offenses each carrying maximum punishments of 20 years.[5] Perhaps what is really at issue is the propriety of charging in a single count that a defendant is an accessory to two offenses of his principal. *See* Fed. R.Crim.P. 8(a) (requiring "a separate

count for each offense"); *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981). Arguably, a section 3 count should be limited to one offense of a principal. Since the parties have not explored the propriety of the Government's approach to the section 3 maximum sentence calculation or the issue of whether the section 3 count is duplicitous, we will not undertake to resolve such matters at this time, but leave them for further consideration by the District Court on remand.

Even if we assume, for purposes of this appeal, that the principals' intermediate maximum sentences may be cumulated for purposes of a section 3 maximum, Bergen contends that his sentence may not exceed 5½ years because the fact that subjects him to a maximum sentence above 5½—the causal relationship between Pizzuto's beating and death—was not submitted to the jury and not found by the jury to have been proven beyond a reasonable doubt.

We agree. The Government acknowledges that *Apprendi* applies, but contends that the *Apprendi* violation is harmless error, because, it contends, Bergen could have received a maximum sentence of 72 months. The Government reaches this figure by adding one-half of the ten-year intermediate maximum of section 241 to the full one-year intermediate maximum of section 242. However, the Government overlooks the need, required by the penalty provision of section 3, to take one-half of the one-year intermediate maximum of section 242. Because Bergen's sentence exceeds by four months the maximum 5½-year sentence that could be imposed with-

---

**5.** We note that the Guidelines ameliorate the rigor of consecutive sentencing by the grouping rules. *See* U.S.S.G. § 3D1.1–4. Charging Bergen in a single count of violating section 3 did not deny him the benefit of the grouping that would have occurred had he been charged in one count of accessory to a section 241 violation and a separate count of accesso-

ry to a section 242 violation. Bergen's Guidelines offense level was determined with reference to his principals' offense level, and that level was determined by the grouping rules. Thus, Bergen's Guidelines sentence, though imposed on a single count, reflected the benefit of grouping.

out jury determination of the cause of Pizzuto's death, his sentence must be reduced by at least four months. Since Bergen's *Apprendi* claim is entirely independent of the issues discussed in Parts II and III, *supra*, which have prompted us to offer the Appellants the opportunity to withdraw their appeals, we believe that Bergen should receive this four-month reduction, even if his appeal is withdrawn. Thus, if Bergen advises that he wishes to withdraw his appeal to avoid the risk of exposure to a higher sentence (based on an increase in maximum sentences faced by his principals), we will dismiss only part of his appeal, and restore jurisdiction to the District Court to reduce the current sentence by four months. Such a partial remand will also permit the District Court to consider whether the principals' intermediate maximum sentences may not be cumulated for purposes of section 3, in which event Bergen's maximum sentence would be further reduced to 60 months (one-half of ten years).[6]

Conclusion

We affirm Bergen's conviction, vacate the sentences imposed on all three Appellants, and remand for resentencing in light of this opinion. The mandate shall be stayed for 30 days to afford the Appellants an opportunity to withdraw their appeals.

---

6. Although we uphold Bergen's *Apprendi* claim at least to the extent of according him a four-month reduction, we face no "jurisdictional" issue of the sort identified in *United States v. Tran*, 234 F.3d 798, 805–10 (2d Cir. 2000), because Count 3, charging the accessory offense, incorporated the allegations of Counts 1 and 2 that the beating caused Pizzuto's death.