**UNITED STATES of America,**
**Appellee,**

v.

**Patrick REGNIER, Defendant–**
**Appellant,**

**and**

**Edward Velazquez, Ivano Bavaro, and**
**Joseph Bergen, Defendants.**

**Docket No. 01–1462.**

United States Court of Appeals,
Second Circuit.

Aug. 26, 2002.

Peter J. Tomao, Garden City, NY, for Appellant.

Sanford M. Cohen, Emily Berger, Assistant United States Attorneys, Alan Vinegrad, United States Attorney, on the brief, Office of the United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee.

Present JACOBS, CABRANES and FRED I. PARKER, Circuit Judges.

## SUMMARY ORDER

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of said District Court be and is **MODIFIED,** and, as modified, **AFFIRMED.**

Patrick Regnier appeals from a judgment of conviction and sentence entered by Judge Mishler following our vacatur of Regnier's original sentence of, *inter alia,* a term of imprisonment for 135 months as a result of his earlier appeal. *See United States v. Velazquez,* 246 F.3d 204 (2d Cir. 2001). On remand, Judge Mishler sentenced Regnier principally to a term of imprisonment for 324 months. Because we conclude that our earlier opinion likely misled Regnier regarding his prospects on appeal, and to avoid the serious constitutional questions that otherwise would result from that conclusion, we modify Regnier's sentence to reflect the original 135–month term of imprisonment, and, as modified, affirm the judgment of the District Court.

### I

Regnier was convicted upon his guilty pleas of conspiring to violate and violating the civil rights of Thomas Pizzuto by, together with others, severely beating Pizzuto in his cell at the Nassau County Correctional Center, where Regnier was a guard. Pizzuto subsequently died from an injury to his spleen sustained during the beating; his spleen was abnormally large because of his drug abuse. The facts of the case are set forth extensively in our opinion on Regnier's prior appeal, *United States v. Velazquez,* 246 F.3d 204 (2d Cir.2001), familiarity with which is presumed.

#### A. The Prior Appeal

In *Velazquez,* Regnier, co-defendant Edward Velazquez, who also participated in the beating and pleaded guilty, and co-defendant Joseph Bergen, who assisted Regnier and Velazquez in covering up the crime and was convicted following a jury trial as an accessory after the fact pursuant to 18 U.S.C. § 3, all appealed, *inter alia,* their sentences. *See* 246 F.3d at 207. The District Court had applied the guideline for voluntary manslaughter, reasoning as follows:

Second degree murder requires a finding that the defendant killed the victim "with malice aforethought." 18 U.S.C. § 1111(a). Manslaughter, on the other hand, is the unlawful killing of a human being without malice. 18 U.S.C. § 1112(a). Voluntary manslaughter is committed "upon a sudden quarrel or heat of passion." *Id.*

Malice is the state of mind that would cause a person to act without regard for the life of another. I do not believe that Defendants Velazquez and Regnier acted with such intent when they entered Pizzuto's cell on January 8. The more appropriate classification for Defendants' actions is voluntary manslaughter under § 1112(a). In determining whether a defendant acted in the "heat of passion" for purposes of § 1112(a),

> "the basic inquiry is whether or not at the time of the killing, the reason and judgment of the defendant was obscured or disturbed by passion ... to such an extent as would cause an ordinarily reasonable person of average disposition to act rashly and without deliberation and from passion rather than judgment".

*United States v. Livoti,* 22 F.Supp.2d 235, 243 (S.D.N.Y.1998) (citing 2 Leonard B. Sand et al., Modern Jury Instructions ¶ 41.02 at 41–46, 47).

I find that Velazquez and Regnier acted in response to Pizzuto's refusal to obey their commands and the abusive epithets

directed to them. I find that Velazquez and Regnier acted in the heat of passion and that Pizzuto's conduct was sufficient to arouse the passion of a reasonable man.

Accordingly, Defendants' conduct is classified as voluntary manslaughter and carries a base offense level of 25.

Sentencing Memorandum dated May 26, 2000, at 5–6, *quoted in Velazquez*, 246 F.3d at 210. On appeal, all parties agreed that the evidence did not support the District Court's finding that the Velazquez and Regnier acted "in the heat of passion." *Velazquez*, 246 F.3d at 211–212. This Court stated that the District Court's finding regarding "heat of passion" raised "three related questions: (1) Did Judge Mishler mean that Pizzuto's assailants lacked the mental state of malice, irrespective of whether they acted in the heat of passion, or that their mental state would have been malice had that mental state not been displaced by heat of passion? (2) Did Judge Mishler use the correct standard for determining the existence of heat of passion? (3) Did Judge Mishler use the correct standard for determining the existence of malice?" *Id.* at 212.

With respect to the "no malice" finding, this Court stated that the District Court's finding was ambiguous, but that the District Court had probably determined that the defendants acted *with* malice, which malice was excused by "heat of passion." *Id.*

With respect to the "heat of passion" finding, this Court held that the evidence in the record likely did not support such a finding, inasmuch as (1) the abusive epithets Pizzuto directed at defendants and his refusal to obey their commands were insufficiently provocative to support a finding that they aroused a "heat of passion," (2) the proper standard for evaluating whether Pizzuto's conduct was provocative

enough to arouse "heat of passion" was whether his actions would arouse the heat of passion "of a reasonable corrections officer," and not a "reasonable man" generally; and (3) the "heat of passion" defense is normally unavailable after some interval of time has elapsed between the provocation and the response. *Id.* at 213.

With respect to the standard used to determine whether the defendants acted with "malice," this Court held that the District Court may have used an incorrect standard. The Court stated, *inter alia,* that:

> in the context of second-degree murder in federal law, the requisite malice can in some circumstances be found when the assailant acts with awareness of "a serious risk of death or serious bodily harm." An intent to cause a serious risk of a serious injury will frequently suffice to demonstrate a heightened disregard for human life, although a fact-finder might in some circumstances conclude that such intent does not indicate the malice required for second-degree murder.
>
> . . .
>
> In particular, an inference of malice might not be appropriate where the victim is assaulted and dies substantially as a result of his unusual and unforeseeable fragility, such as a thin skull or hemophilia. . . . Of course, a beating that causes the death of an especially vulnerable victim might well permit a finding of malice if the evidence shows that the extent of the beating would have posed such a serious risk of serious injury to an average person as would demonstrate the assailant's heightened disregard for human life.

*Id.* at 214–15 (citations & internal quotation marks omitted).

Accordingly, the Court vacated the sentences and provided the following guidance for the District Court's use on remand:

In the pending case, if, on remand, voluntary manslaughter is rejected because heat of passion cannot be validly found under the applicable standard, the choice between second-degree murder and involuntary manslaughter will turn on how great a risk of serious bodily injury Pizzuto's assailants could reasonably apprehend would result from their assaultive conduct and what that risk reveals about the degree of their indifference to Pizzuto's life. On this issue, if it arises, further findings will be needed. In particular, it will be necessary to determine whether there was a substantial risk that the repeated punching and kicking administered by Velazquez and Regnier would inflict serious bodily injury on an average adult, sufficient to infer an extreme indifference to human life, or whether the resulting laceration of Pizzuto's spleen occurred primarily because it was enlarged five or six times normal weight, a circumstance that was not reasonably foreseeable.

*Id.* at 215.

Because vacating the sentences could result (if, on remand, the District Court found that the second-degree murder guideline was applicable) in a substantially higher sentence, this Court gave the defendants-appellants the opportunity to withdraw their appeals. *See id.* at 216–17. Velazquez and Bergen did so; Regnier did not.

### B. Re-sentencing Proceedings

On remand, the district court found, *inter alia*, that "Velazquez and Regnier entered Pizzuto's cell *with the intention of administering serious injuries*," Mem. Decision & Order at 5 (emphasis added), which finding was consonant with its state-ment at the Conference earlier that day "before they entered the cell, both Mr. Velazquez and Mr. Regnier *intended to beat Mr. Pizzuto mercilessly*," Tr. of Aug. 17, 2001, Conf. at 12 (emphasis added). Accordingly, it held that the second degree murder guideline was applicable, and sentenced Regnier principally to a term of imprisonment for 324 months. This appeal followed.

On appeal, Regnier principally argues that the District Court applied the wrong standard and failed to comply with this Court's instructions in determining whether Regnier acted with malice aforethought, resulting in clearly erroneous findings. He also contends that (1) the District Court erred in not permitting him to present evidence on the cause of death; (2) the District Court lacked authority to increase Regnier's sentence on remand because the Government did not cross-appeal the earlier sentence; and (3) the District Court erred in not granting a downward departure for conduct "outside the heartland" of the second-degree murder guideline.

### II

Although the matter is not free from doubt, we believe the District Court used the standard we set forth in *Velazquez* to determine whether Regnier acted with "malice aforethought." In the August 17, 2001, Decision and Order, the District Court quoted our statement in *Velazquez* that malice aforethought may be found when a defendant acts with "awareness of 'a serious risk of death or *serious bodily harm*.'" Mem. Decision & Order at 3. Immediately thereafter, the District Court stated its finding that "Velazquez and Regnier entered Pizzuto's cell *with the intention of administering serious injuries*," *id.* at 5 (emphasis added), which finding was consonant with its statement at the Conference earlier that day "before they en-

tered the cell, both Mr. Velazquez and Mr. Regnier *intended to beat Mr. Pizzuto mercilessly,*" Tr. of Aug. 17, 2001, Conf. at 12 (emphasis added). The District Court also quoted the standard for malice aforethought as articulated in *United States v. Milton,* 27 F.3d 203, 206–07 (6th Cir.1994), which we quoted in *Velazquez,* 246 F.3d at 214. Mem. Decision & Order at 6.

Where a district court has used the correct legal standard, we ordinarily do not disturb its factual findings on sentencing unless those findings are clearly erroneous. *See* 18 U.S.C. § 3742(e); *United States v. Chalarca,* 95 F.3d 239, 244 (2d Cir.1996). In this case, however, our analysis of whether the record supports the District Court's finding of malice has led us to the conclusion that our opinion in *Velazquez* may have unintentionally misled Regnier as to the risks and potential benefits of pursuing a challenge to his earlier sentence, which, in turn, raises not insubstantial constitutional questions.

In *Velazquez,* we held that the District Courts's definition of malice as "the state of mind that would cause a person to act without regard for the life of another" was incomplete. 246 F.3d at 214. We then explained that in cases involving *reckless* killings, the distinction between second-degree murder and involuntary manslaughter depends upon the degree of recklessness—*i.e.,* whether the recklessness is so extreme that it evinces a "heightened disregard for human life." *Id.* at 214–15. Continuing in the same vein, we instructed that "if, on remand, voluntary manslaughter is rejected because heat of passion cannot be validly found under the applicable standard, the choice between second-degree murder and involuntary manslaughter will turn on how great a risk of serious bodily injury Pizzuto's assailants could reasonably apprehend would result from their assaultive conduct and what that risk reveals about the degree of their indifference to Pizzuto's life. On this issue, if it arises, further findings will be needed." *Id.* at 215.

In discussing the "malice aforethought" standard only in terms of recklessness, we may have unintentionally misled the parties (and perhaps the District Court) into considering that "recklessness" was the only issue. We have expressly held, however (albeit in a first-degree murder case), that "malice aforethought" within the meaning of 18 U.S.C. § 1111 may be found from the intent to commit *a felony. See United States v. Thomas,* 34 F.3d 44, 48–49 (2d Cir.1994). And at least one other Circuit has expressly (and correctly, in our view) held that 18 U.S.C. § 1111's second-degree murder provision encompasses felony murder. *See United States v. Pearson,* 159 F.3d 480, 486 (10th Cir.1998) ("[S]econd degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; (3) depraved-heart; or (4) commission of a felony when the felony in question is not one of those specified in the first degree murder paragraph of § 1111(a).").

Inasmuch as Regnier caused Pizzuto's death while acting in furtherance of a felonious conspiracy, *see* 18 U.S.C. § 241, it appears that he could be sentenced pursuant to the second-degree murder guideline on that basis alone, even if the District Court's findings regarding the actual assault are clearly erroneous. But neither Regnier nor his counsel likely apprehended the possibility of a finding of "malice aforethought" based on the intent to commit the underlying felony when Regnier made the decision to not withdraw his appeal, as this Court had invited him to do. *See* 246 F.3d at 217. Indeed, the Government conceded at oral argument that it

had never raised the issue of whether Regnier's intent to commit the underlying felonies, standing alone, was sufficient to support a finding of "malice aforethought."

We may also have misled the parties (and the District Court) by following the Government into an error of law. We stated that "[w]ithout proof of malice, [defendants'] underlying offense would be, *at most,* manslaughter (either voluntary or involuntary)." *Velazquez,* 246 F.3d at 214 (emphasis added). In so stating, we repeated the Government's position, which was based, in turn, on the Government's interpretation of the guidelines as requiring that Regnier be sentenced pursuant to the most "analogous" guideline. As articulated at oral argument, the Government's view is that only the murder or manslaughter guidelines are "analagous," because the use of any other guideline would require the court to "overlook" Pizzuto's death.

■ In fact, however, the Government's interpretation of the guidelines is mistaken. The guideline applicable to Regnier's offenses of conviction is U.S.S.G. § 2H1.1 ("Offenses Involving Individual Rights"). That guideline provides, in relevant part, that the base offense level is the greatest of "the offense level from the offense guideline *applicable to any underlying offense*" or 12, if, as here, the offense involved two or more participants. Accordingly, in determining which guideline provides the greatest offense level for purposes of U.S.S.G. § 2H1.1, the District Court is not limited to the "most analogous" guideline,[1] but must instead look at all *applicable* guidelines.

The involuntary manslaughter guideline, U.S.S.G. § 2A1.4, provides for a base offense level of 14 if the conduct was reckless or 10 if the conduct was criminally negligent. Thus, based on our original opinion, Regnier could have believed that, if he convinced the District Court that he did not act with malice aforethought, he faced *at worst* a base offense level of 12 or 14. The aggravated assault guideline, U.S.S.G. § 2A2.2, however, which is applicable to an assault with intent to commit a felony *or* to an assault resulting in serious bodily injury, provides for a base offense level of 15 plus upward adjustments for specific offense characteristics, including a 6 level increase if the degree of bodily injury is "permanent or life-threatening." U.S.S.G. § 2A2.2(b)(3). If this guideline is applicable to Regnier's conduct (and we do not see why it would not be),[2] then it—and not the involuntary manslaughter guideline—would be the "greatest" of "the offense level from the offense guideline applicable to any underlying offense" within the meaning of U.S.S.G. § 2H1.1 if there was no finding of malice.

---

1. Some guidelines instruct district courts to impose sentences based on the most "analagous" guideline. *See, e.g.,* U.S.S.G. § 2K2.1(c)(1)(B) (guideline for firearms offenses, providing that "[i]f the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense [and] ... death resulted, [use] the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than [the otherwise-applicable offense level]"); *id.* § 2K1.4(c)(1) (guideline for arson, similar).

2. The elements of assault resulting in serious bodily injury are: (1) an action constituting common-law assault (either a willful attempt to inflict injury upon the person of another, or a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm) that (2) results in a serious bodily injury. The government need not prove the specific intent to cause a serious bodily injury. *See United States v. Loera,* 923 F.2d 725, 727–28 (9th Cir.1991).

The difference between the involuntary manslaughter guideline and the aggravated assault guideline is not trivial for sentencing purposes. If the involuntary manslaughter guideline were the greatest "applicable," then Regnier's base offense level would start as low as 12, which would have resulted, all other adjustments being equal, in a sentencing range of 33–41 months. If, on the other hand, the aggravated assault guideline were the greatest "applicable," then the minimum applicable base offense level would be 15 plus adjustments for offense characteristics, which substantially reduces the potential "benefit" of challenging the District Court's earlier application of the voluntary manslaughter guideline because Regnier's sentencing range could be as high as 108–135 months (and no lower than 46–57 months) using that guideline, all other adjustments being equal.

■ The possibly misleading nature of our opinion in *Velazquez* raises a substantial question regarding whether holding Regnier to his decision to continue to contest his earlier sentence following that opinion would violate his right to Due Process of Law guaranteed by the Fifth Amendment to the United States Constitution. In general, due process requires that criminal defendants' waivers of their rights be knowing and voluntary. *See, e.g., Henderson v. Morgan,* 426 U.S. 637, 645 & n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976) (guilty plea must be knowing and voluntary); *United States v. Ready,* 82 F.3d 551, 556 (2d Cir.1996) (waiver of right to appeal sentence); *United States v. Fontanez,* 878 F.2d 33, 36 (2d Cir.1989) (waiver of right to be present at trial). Accordingly, we have not enforced waivers where the defendant may have been misled by the Court as to the nature of his rights. *See, e.g., United States v. Harrison,* 241 F.3d

289, 292–94 (2d Cir.2001) (vacating guilty plea where the district court mistakenly advised the defendant that he was subject to a mandatory minimum); *United States v. Andrades,* 169 F.3d 131, 135–36 (2d Cir.1999) (vacating guilty plea where district court failed to adequately inform the defendant of the elements of the offense); *Ready,* 82 F.3d at 557 (declining to enforce waiver of right to appeal sentence where district court misstated the scope of the waiver).

In this case, the Government's failure to timely appeal Regnier's original sentence granted him the right to "enjoy" the "benefits" of that sentence. *Cf. United States v. DiFrancesco,* 449 U.S. 117, 136, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980) (a defendant has a constitutionally protected expectation of finality in a sentence when "the appeal is concluded *or the time to appeal has expired*" (emphasis added)). For that reason, we stayed the mandate in *Velazquez* to give Regnier and his co-defendants a full and fair opportunity to consider whether to continue contesting their sentences in light of the danger that their sentences would increase on remand. *See Velazquez,* 246 F.3d at 216–17. In light of the possibly misleading nature of our opinion in *Velazquez,* we have substantial doubt as to whether Regnier gave up his expectation of finality in his earlier sentence "knowingly."

To avoid resolving this substantial constitutional question (as well as the question we avoided in *Velazquez* of whether the government's failure to appeal the earlier sentence barred the imposition of an increased sentence on remand, *see id.* at 215–17), and because, at oral argument, the Government agreed that it was "satisfied" with the earlier sentence of 135 months, we find it appropriate in this high-

ly unusual case to relieve Regnier of the effects of his decision to continue to contest his earlier sentence and to restore to him the "benefits" of that sentence. Accordingly, we modify the judgment of conviction to reflect a sentence of 135 months, and, as modified, affirm the judgment of the District Court.